**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:08cv489**


| | | |
|---|---|---|
| **RHONDA L. UNTERREINER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

     **THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 8] and the  Defendant's Motion for Judgment on

the Pleadings [Doc. 9].

**I.    PROCEDURAL HISTORY**

     The Plaintiff Rhonda L. Unterreiner filed an application for disability

insurance benefits on May 13, 2003, alleging that she had become

disabled as of March 15, 1999.  [Transcript ("Tr.") 92-94].  The Plaintiff's

application was denied initially and on reconsideration.  [Tr. 82-86, 77-78].

A hearing was held before Administrative Law Judge ("ALJ") Paul Armitage

on March 6, 2006.  [Tr. 712-750].  On September 11, 2006, the ALJ issued a decision allowing the Plaintiff benefits beginning April 15, 2003 under section 1614(a)(3)(A) of the Social Security Act, and denying the Plaintiff benefits for previous periods under sections 216(i) and 223(d).  [Tr. 19-42]. The Appeals Council received and added new evidence to the record [Tr. 9] but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  [Tr. 6-8].  The Plaintiff has exhausted all available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).  The Fourth Circuit has defined

"substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III. THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits

the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id. In this case, the ALJ's determination was made at the fourth step.

## IV. FACTS AS STATED IN THE RECORD

The Plaintiff was born on October 21, 1967 and was 38 years old at the time of the ALJ's hearing. [Tr. 92, 712]. The Plaintiff quit school in the midst of the 10th grade and later obtained a GED. [Tr. 722, 719]. Her relevant employment history includes work in factory production, as a waitress, auto transport worker, and cosmetologist. [Tr. 89-91, 720].

At the time of the hearing, Plaintiff described her disabling conditions as head, back, neck and hand problems, and psychological impairments. [T. 741]. Her daily activities consisted of taking care of her son and trying to do things other than sleep. [T. 742].

The Plaintiff's social and behavioral history up to April 15, 2003 (the date from which benefits were granted) is in evidence as follows:

She quit school due to pregnancy and had her first child at age sixteen. Later, she married that child's father, but the child was raised by Plaintiff's mother. Two years later her second child was born. She and her first husband separated in approximately June, 1986 (T. 101-105). In early 1989, Plaintiff moved to Florida to escape involvement with "the wrong people" and with drugs. There, she enrolled in a mental health/drug treatment program which she successfully completed. [T. 724]. There, she remarried, to a police officer with whom she had another child and moved numerous times, living in places for only a few months before moving again. [T. 106-7, 724, 727, 732 ]. Her husband abandoned her with a small child for four months during one of those moves. [T. 732]. She was physically abused and assaulted by husbands, boyfriends and others from 1994 to 1996, 1999, 2000, 2001 and 2003, sustaining injuries to her head, back, body, legs, and both hands, but not always seeking medical attention

for her injuries. [T. 108, 721, 722, 729-30, 735, 740, 743].   She separated from her second husband in 2000.  [T. 736]  He had her arrested and she was homeless for a period of time, later obtaining housing assistance.   [T. 736-7].  She served 10 days in jail and 12 months' probation for a DWI in November 2001; her driver's license was suspended indefinitely.  [T. 442-448]  Her relationships with her family of origin and her efforts at child rearing were consistently troubled. [T. 102-5, 737, 747].

The evidence regarding Plaintiff's history of treatment for the mental health issues up to April 15, 2003 is as follows: The Good Samaritan Clinic referred her to Smoky Mountain Mental Health in 1999, where she was seen only 10 times through May 2003.  [T. 384-419, 734].  In 2001, she had an inpatient psychiatric admission at Frye Hospital in Hickory, which the hospital describes as voluntary and the Plaintiff as involuntary. [T. 247, 739].  After the 2001 DWI,  she was court-ordered into a program with Gateway, a drug and alcohol treatment center. [T. 442-448]  She had a second involuntary commitment in February 2003 at Rutherford Hospital, on a commitment petition filed by friends due to depression, suicidal ideation, and injuries from a beating.  [T. 26, 740, 304-308].  Though her encounters with trained mental health professionals were rare,  reluctantly obtained, and featured her denying any mental health problems, her

physical health records show several references where those providers observed symptoms of depression, anxiety, and need for counseling. These were noted in June 1999 at the Good Samaritan Clinic [T. 357], in April 2000 by Dr. Plaut [T. 216, 219], by Dr. Hankley in March 2002 [T. 260-1], by Dr. David in April 2002 [T. 257], by Dr. McGhee in August 2002 [T. 438], and by Dr. Young in March 2003 and May 2004 [T. 605, 612]. By the time of the hearing, she had developed a deep suspicion and fear of medication, doctors, social service workers, police, and other authorities and as such had not sought medical treatment or taken medications since mid-2005. [T. 743-7].

The Plaintiff's physical health history up to April 15, 2003 is in evidence as follows: Prior to 1999, she had no regular treating relationship with any doctor. Her only medical treatment of record is in 1996 for her hands, injured in a beating by her husband. [T. 171-191] In 1999 she began getting regular treatment for her back problems and multiple symptoms including pain, at the Good Samaritan Clinic in Haywood County. She began a treating relationship with Dr. Plout, a family doctor, in 2000; then she switched to Dr. Teeter. [T. 737-8]. She initiated treatment with a neurologist in early 2003. [T. 309]. She was in a serious car accident in 2001, where her head, neck and upper and mid-back were

injured, and a previous domestic abuse injury to her mid-back was aggravated. A period of pain medication and physical therapy followed, featuring subjective worsening of symptoms of back and neck pain, but only mild objective findings that did not correlate with the "symptom pattern". [T. 254-278]. In January 2003 she sustained a beating that injured her head, teeth, body and legs. She sought care from her family physician in January, and was noted to have two black eyes, bruised legs, and a worsening of existing dizziness, memory loss and headaches. [T. 309-10]. She was hospitalized at Haywood Regional Medical Center on February 6, and was "led to believe [she] was in a brain trauma center," and did undergo a CT scan of her head, but was actually admitted based upon an involuntary commitment petition by friends referenced above. [T. 741, 291-303].

The Plaintiff's employment history is in evidence as follows: She obtained a GED and vocational degree in cosmetology at South Technical Education Center in Florida in 1992. [T. 102]. Injuries to both hands from domestic violence in late 1995 stopped her work as a cosmetologist. [T. 730-731] Shortly thereafter, back problems put an end to her work as a waitress, which she had done off and on throughout the early-mid 1990s. [T. 731]. She then tried work as an auto transporter, but

it was very heavy work and she did it little enough that Defendant concedes it does not constitute substantial gainful activity. [T. 731-2, Doc. 10-5]. During the period of frequent moves, she worked little. [T. 106-7] In 1999 she moved to Haywood County where she made significant efforts to obtain health care. She also sought and was evaluated for vocational rehabilitation, but never returned to gainful work. [T. 734-5, 223-228]. In that evaluation, her scores were consistent with a "high average" range of intellectual capacity, and could benefit from vocational rehabilitation once pain control and emotional stability were established. [T. 223-228].

Because Plaintiff was granted benefits on and after April 15, 2003, it is unnecessary to recount here facts after that date.

## V. THE ALJ'S DECISION

On September 11, 2006, the ALJ issued a decision denying the Plaintiff's claim for the period between March 15, 1999, and April 15, 2003. [Tr. 19-42]. Before engaging in the sequential evaluation, the ALJ determined that the Plaintiff's date last insured ("DLI") was December 31, 1999. [Tr. 23]. Proceeding to the sequential evaluation, the ALJ found that the Plaintiff had not engaged in any substantial gainful activity since her alleged onset date of March 15, 1999. [Tr. 25, 92]. The ALJ then found that the medical evidence did not establish substance abuse disorder or

organic brain disorder to be severe impairments prior to the Plaintiff's DLI, but that the medical evidence did establish cervical, thoracic and lumbar strain with mild cervical degenerative disease at C4-5,fibromyalgia/myalgia-type pain, depressive disorder with anxiety and bipolar features, and personality disorder to be severe impairments. [Tr. 25, 39]. The ALJ concluded, however, that these impairments did not meet or equal any of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 27]. The ALJ then assessed the Plaintiff's residual functional capacity and determined that prior to April 15, 2003, the Plaintiff was capable of light level work that did not require performance of skilled tasks. [T. 27]. Because the Plaintiff's past work as an auto transporter and waitress did not exceed the bounds of the Plaintiff's residual functional capacity prior to April 15, 2003, the ALJ concluded that the Plaintiff could perform her past work. Accordingly, the ALJ concluded that prior to April 15, 2003 the Plaintiff was not "disabled" as defined by the Social Security Act but that from April 15, 2003 onward, she was so disabled. [Tr. 41]. This finding fell after her date last insured, and resulted in the granting of benefits under Title XVI but not Title II. [Id.].

## VI.    DISCUSSION

The Plaintiff argues that the ALJ erred in his step 4 evaluation, specifically in (A) not granting controlling weight to the opinions of mental health professionals Dosch, Felix, and Manes and orthopaedist Dr. James Faulk; (B) determining that her work as auto transporter was substantial gainful activity constituting past relevant work; (C) that she had the residual functional capacity (RFC) to perform her past relevant work as a waitress. These assignments of error will be addressed *seriatim*.

### A.    Weight attributed to medical opinions

"Regardless of its source, we [the Social Security Administration] will consider every medical opinion we receive."  20 C.F.R. 404.1527(d).  The Secretary has provided guidelines for evaluating medical opinions regarding impairments and disability in regulation 20 C.F.R. § 404.1527. These ask the fact-finder to weigh: (1) the examining relationship (more weight to an examining than a non-examining physician); (2) the treating relationship (more weight to treating than consultative sources); (3) supportability (whether the report is based on detailed findings or merely conclusory); (4) consistency (internally and compared to the record as a whole); (5) specialization (whether the source is board certified or whose qualifications are suspect); and (6) "other factors" (unspecified).  *See* <u>Vest</u>

v. Astrue, 2009 WL 899418 S.D.W.Va., 2009 at *5.

Plaintiff asserts that the ALJ erred in failing to give deference to the opinions of three different mental health professionals and one orthopedist; she believes that the ALJ substituted his own conclusions for theirs. The weighing of the factors under §404.1527, however, does not require simple deference to the opinions of any particular health care providers. The ALJ properly conducted the analysis the regulation requires. The ALJ reviewed evidence and opinions of Mr. Manes, noting deficiencies in his credentials and short period of interactions with Plaintiff in declining to adopt his opinion. [T. 39]. Indeed, interactions between Plaintiff and Mr. Manes were initiated by and prescribed within the boundaries of a court-ordered DWI Assessment, rather than being the open-ended therapeutic relationship between doctor and patient typically afforded treating physician status. Consistent with those narrow parameters, Mr. Manes' notes of encounters with Plaintiff from April 2002 to August 2003 reflect his recording of details, feelings and symptoms described to him by Plaintiff but do not reveal any evaluation, diagnostic findings or treatment work on his part. [T. 444-458]. Thus those records offer little justification for affording them or his August 27, 2003 conclusions much weight. The ALJ did not err in his attribution of evidentiary weight to the Manes records.

Although the conclusions stated therein are consistent with the conclusions of others for at least some of the time periods covered, Mr. Manes' opinions and encounter records offer nothing probative to the step 4 issue of what limitations her stated psychological impairments impose on her ability to work.

The ALJ evaluated the opinion of Arthur Dosch, staff psychologist at Smoky Mountain Center, noting lack of supporting objective findings and a brief and dated treatment history in finding Dr. Dosch's opinion conclusory and declining to adopt it. [T. 30]. The August 2000 opinion is 3 sentences in length, citing no support for its conclusion that she is not ready for gainful employment. [T. 403]. Good cause for not giving the treating physician's opinion controlling weight is found when the treating physician's opinion was conclusory. Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir.2004). Physicians' opinions must be reasoned and rest on documentation adequate to support their conclusions. Viscosi v. Shalala, 1998 WL 102670 (N.D. Ill., 1998). To the extent Dr. Dosch's opinion impliedly relies on Plaintiff's encounter with Smokey Mountain Center one year prior, no evidentiary weight is added. Plaintiff stated during the intervening year that she did not need psychological treatment. This contradicts the proposition that she had a severe psychological impairment

at that time.  [T. 413]  Further, that record does not evidence any disabling limitation on functions required for work in 1999 or 2000.  [T. 408-419].  As such, the ALJ's consideration of Dr. Dosch's opinion was consistent with the requirements of §404.1527.

The ALJ considered the medical records of R.R. Felix, M.D., a psychiatrist.  These were prepared in October 2002 on a Report of Medical Examination Requested by Haywood County Department of Social Services.  The ALJ discredited Dr. Felix's disability opinion based on the brevity of the treating relationship, which consisted of one, 45 minute visit. [T. 34, 387-388].

To the extent that Plaintiff wants this report afforded weight as an "other agency" disability opinion, Plaintiff would need to demonstrate that the definitions and processes for which DSS uses this form are the same as those of the Social Security Administration for evaluating disability. SSR 06-03p at *6-7.  No such showing was made.  Some weight is due to the disability-related findings of other agencies, but those are not dispositive.  S.S.R. 06-03p; Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968), citing Hayes v. Celebrezze, 311 F.2d 648, 654 (5th Cir. 1963).

Dr. Felix concludes on this form that after October 2002, Plaintiff will be unable to work for a period but does not provide objective findings to

support this conclusion.   The form also provides nothing indicating the specific sorts of limitation on ability to work as is required by 20 C.F.R. 404.1520 and 1520a, i.e. limitations on activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

## B.   Auto Transporter Job as Substantial Gainful Activity

Defendant's counsel has conceded that the ALJ erred in treating the auto transporter job as past relevant work, noting that the earnings records show insufficient earnings for such work to have constituted substantial gainful activity.  [Doc. 10-5].  Other forms of past relevant work were established, namely waitressing and cosmetology, and are supported by substantial evidence and not contested by Plaintiff.  [T. 40] One of them, waitressing, was classified by the ALJ as unskilled, light work, a classification that Plaintiff does not contest.  Because other, uncontested past relevant work does exist, the step 4 evaluation can continue and the ALJ's error as to one job is harmless.

## C.   An RFC for light, semi-skilled or unskilled work before April 15, 2003 is supported by substantial evidence.

Plaintiff argues that the ALJ erred in concluding that she had a residual function capacity (RFC) to perform past relevant work.  In support

of this argument Plaintiff points to the opinion of Dr. Faulk dated August 22, 1999, indicating she should do "fairly light duty" jobs with no repetitive bending or lifting as contraindicating her retention of a light level RFC at that time.  The ALJ noted [T. 35] but did not grant controlling weight to Dr. Faulk's opinion in creating his RFC.  There is substantial evidence to support the ALJ's determination and he properly applied the factors set out herein for affording weight to medical source opinions.  Before indicating those work limits for Plaintiff, Dr. Faulk had had only one appointment with her.  That opinion did not cite to his reviewing any other records, and in it he noted only mild degenerative changes to her thoracic and cervical spine.  No surgery was indicated.  [T. 200-1].  His own objective findings do not particularly support those limits, and the brevity with which they are stated does not specifically map them to elements under the Regulations that contraindicate light work.   *See* Burnette v. Astrue, 2009 WL 863372 (E.D.N.C. 2009) at *5 (wherein the Court addressed scenarios in which terms used by physicians also happen to be terms of art in the evaluation of residual functional capacity and declined to assume they have the same implications in the separate contexts.) The ALJ also cited to many other treatment records generated over a long period before and after Dr. Faulk's one encounter with Plaintiff that contraindicate the bending and lifting

limitations indicated by Dr. Faulk.  [T. 35-6].  These provide substantial evidence supporting the ALJ's treatment of that opinion.

Plaintiff implies, in assigning error to the ALJ's failure to give weight to opinions of her several mental health treatment providers, that those opinions or the related treatment records would establish limitations from her mental impairments that contraindicate an RFC of light, semi-skilled or unskilled work.  As discussed in Part VI. A, *supra*, the ALJ did not err in his attribution of weight to those opinions, and none of those opinions or the respective related treatment records contain any evidence of residual function limitations stemming from her admittedly severe mental impairments.  Plaintiff's counsel has advocated admirably in filling in gaps in Plaintiff's mental health treatments via other evidence implying the persistence of Plaintiff's mental impairments.  But that evidence supports only the finding of severe impairment, not limitations on her ability to work that differ from the ALJ's assessment.

The ALJ evaluated the existing records and found evidence supporting his intellectual functioning findings [T. 36] and that Plaintiff's impairments responded to counseling and medication.  [T. 36-37]  He performed the special technique mandated by 20 C.F.R. 404.1520a in evaluating mental impairments, and the conclusions he reached are

supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the Commissioner applied the correct legal standards and that there is substantial evidence to support the Commissioner's determination that the Plaintiff was not disabled before April 15, 2003 within the meaning of the Social Security Act.

### O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 8] is **DENIED**; the Defendant's Motion for Judgment on the Pleadings [Doc. 9] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED**.



Signed: March 24, 2010

Martin Reidinger
United States District Judge